VACUUM CLEANER CO. v. INNOVATION ELECTRIC CO., Inc.

(District Court, S. D. New York. June 23, 1916.)

1. PATENTS ⊕⟂328—VALIDITY AND INFRINGEMENT—VACUUM CLEANER.

The Kenney patent, No. 847,947, for a vacuum cleaner, was not anticipated, is valid, and covers a highly meritorious invention. Claim 4 also *held* infringed.

2. PATENTS ⊕⟂165—CONSTRUCTION OF CLAIMS—DEFINITENESS.

The use of relative terms in a patent claim, such as "sufficient vacuum" or "narrow," does not necessarily destroy the claim for indefiniteness; nor are such terms to be deprived of reasonable elasticity, provided the court is satisfied that the disclosure is clear and practicable, and that the invention on its merits is entitled to an interpretation which will preserve to the inventor the just results of his contribution.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. ⊕⟂165.]

3. PATENTS ⊕⟂289—ACCOUNTING FOR INFRINGEMENT—DELAY IN BRINGING SUIT.

Where complainant, the owner of a patent, with full knowledge that defendant was making, openly advertising, and selling a device respecting which, on complainant's request and claim of infringement, it supplied full information, waited five years, and until the termination of other litigation over the patent, before commencing suit for infringement,

---

it is not entitled to an accounting for profits or damages during such time.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 467–469; Dec. Dig. ☞289.]

In Equity. Suit by the Vacuum Cleaner Company against the Innovation Electric Company, Incorporated, to restrain infringement of claim 4 of letters patent No. 847,947, for a vacuum cleaner, granted to David T. Kenney March 19, 1907. Decree for complainant.

Charles Neave, William G. McKnight, and Frank C. Cole, all of New York City, for plaintiff.

Francis W. Parker, of Chicago, Ill., and A. L. Kent, of New York City, for defendant.

MAYER, District Judge. [1] It is apparent that this is regarded as a test case of considerable importance, in view of the extensive commercial growth of the vacuum cleaning art. As many devices are now on the market, it is not possible to foresee whether the decision here arrived at will be far-reaching in its effect, or merely confined to the subject-matter of this particular controversy; but, appreciating the possible influence which the ultimate result of this case may have on the commercial art, and in view of the exhaustive and able manner in which the case was presented by counsel, I have again studied the history of the art and followed in minute detail defendant's elaborate analysis of the file wrappers.

The true approach to the consideration of an alleged invention starts with the mental attitude which the claimed achievement is entitled to attract. There is, at times, confusion in the use of familiar terms of description or definition, such as "basic," "pioneer," "primary," and "improvement," and I prefer the method which seeks to ascertain at the outset what in fact has been the contribution of the patentee to the knowledge of the arts and the public welfare, rather than to be concerned too rigidly with the exact placement of the patent under some generic or specific definition.

The case at bar has confirmed the conclusion announced in Vacuum Cleaner Co. v. American Rotary Valve Co. (D. C.) 227 Fed. 998, that Kenney founded the modern art of vacuum cleaning, and that his invention has not only added much in the way of greater comfort and improved hygienic conditions from the household to the skyscraper, but has opened up opportunities for extensive manufacture, with the consequent employment of labor from the mechanic to the salesman.

Such an invention is of great merit, and, in determining its scope, the courts must endeavor to look at the patent in suit and at the prior art with the eyes of yesterday, and to realize what could or could not be accomplished to-day, if the prior art alone had been followed and the disclosures of the patent had never been made.

The fundamentally important proposition which Kenney taught the art, and practically exemplified, was the vacuum idea as contrasted with the air current theory. He may not have known the ramifications of the scientific side, but what he did know was that, if certain

instrumentalities are employed in a certain way, the dirt will be sucked up from beneath the surface to be cleaned.

Throughout the proceedings in the Patent Office, Kenney stood his ground and step by step overcame the objections and references made by the Office in the course of the prosecution of his patents. The presumption which goes with the grant is fortified in this case by the careful and diligent examination to which Kenney's applications were subjected. Claim 4 originated in Kenney's application (No. 147,968) filed March 16, 1903, and that application eventuated in the patent in suit. The claim was at first rejected, and·after further proceedings Kenney appealed ·to the Board of Examiners in Chief. That board reversed the examiner; and held claim 1 (claim 4 of the patent in suit) allowable, pointing out that the British patent to Howard and Taite was for an inoperative structure. The Patent Office then required that this claim, then contained in Kenney's application 147,968, should be transferred to Kenney's pending application for the patent in suit, and on December 29, 1906, Kenney, in obedience to this requirement, transferred claim 1 of No. 147,968 to his application for the patent in suit.

Referring to the specification in which the claim originated, the following appears:

"In the form of hand implement illustrated in detail in Figs. 2, 3, 4, and 5, a stock *1*, which is in the shape of a nose or nozzle and incloses a suction chamber, has formed on it a contact surface *2*, which is pierced by a narrow and restricted slot *3*. The slot is in unobstructed communication .with the chamber, and is bounded and defined by lips which surround the slot; these lips, forming the edges at the outer end or mouth of the slot, also form the contact surface of the cleaner, and the outward mouth of the slot lies in the plane of this contact surface, so that, when the cleaner is applied to a floor or other surface to be cleaned, the lips and restricted outward mouth of the slot will be ·brought into contact therewith."

This extract from the specification shows clearly that Kenney intended that the lips were to make a sealing contact with the surface to be cleaned. But a reading of the claim, which is phrased in clear and simple language, would have been sufficient, without the further aid to interpretation abundantly found in the file wrapper; for claim 4 reads as follows:

"A cleaner comprising a suction chamber provided with a narrow inlet slot, the slot being bounded and defined by lips which lie in the contact surface of the cleaner, with the outward mouth of the slot lying in the plane of this contact surface, substantially as described."

The criticisms now made of the claim are sufficiently disposed of by what was said in Vacuum Cleaner Co. v. American Rotary Valve Co., supra, and in the opinon on the motion for preliminary injunction in this suit, except possibly in respect of the "suction chamber" and the limitation to a structure having "projecting lips," which defendant urgently, insists upon.

The application in which the claim originated clearly defines what is meant by suction chamber as follows:

"The suction chamber in the stock is merely a communicating passageway for the air between the slot and the tubular portion of this passageway. It

is of sufficient capacity to freely allow the air to pass and is without sharp corners or enlarged portions where the velocity of the air can become reduced and the dust deposited."

The contention that claim 4 must be limited to a structure having projecting lips is disposed of by the fact that the tool illustrated and described in the application in which the claim originated is free from projecting lips, and the wording of the claim itself does not give any solace to the contention now made. In effect, the position of the defendant is that the patent is limited to a high vacuum system; that the cleaning tool must have a large suction chamber, provided with an exceedingly narrow slot, the edges of which have protruding lips. Thus construed, the argument is that defendant does not infringe, because its devices are provided with vacuum producers utilized in connection with a cleaning tool which has a wide open mouth, with no suction chamber and no protruding lips. The argument on broader grounds rests upon the proposition that defendant's devices operate upon the air current principle, so that the dirt is removed solely by the action of air currents, which, in passing by the dirt, lift it and carry it away, as distinguished from the vacuum principle of the patent in suit, which, as the expert Reeve puts it, acts on a sort of tornado principle, whereby the dirt is violently disturbed and sucked, so as ultimately to reach the depositary receptacle.

To illustrate the theories entertained by Lucke, defendant's expert, and Reeve, plaintiff's expert, numerous demonstrations were given by Lucke at Columbia University and by Reeve at a shop known as Boucher's. It is not practicable, within the reasonable limits of an opinion, to describe these demonstrations at length. Much was interestingly said by both experts as to the meaning and theory of their respective demonstrations, and it probably will be some time before conscientious experts can agree as to the scientific theory of the operation of these devices.

In the use of defendant's structure there undoubtedly is some air current action; but that is merely incidental, and the structure operates upon the so-called vacuum principle consistently urged by Reeve throughout a series of litigations. The same must be said of defendant's devices, for there was one demonstration which, in my opinion, conclusively resolved any doubt which might have been entertained as to the principle upon which defendant's devices operated. Although defendant's business circulars addressed the public upon the representation that their machines are desirable because they remove deep-seated dirt, the theory of defendant's case was that their machines remove, in the main, only surface dirt; that theory being advanced to support, by experimental demonstrations, Lucke's theory of air currents. At Boucher's, however, Reeve trampled into a carpet a considerable amount of dirt, and, to the observer, the carpet seemed clean. When, however, defendant's devices were applied, it was surprising to see how much dirt was in the clean-looking fabric, and how efficiently defendant's devices took up this dirt, and in a manner which

can be explained only upon the theory that defendant's devices operated on the same principle as the Kenney patent.

[2] Of course, where a patent by its very nature speaks of dimensions in relative terms, a skilled man, by rearrangement, or an increase here and a decrease there, may devise a structure which on mere inspection would seem not to infringe; but where, as here, the invention is highly meritorious, and the principle employed in the alleged infringing device is the same as that disclosed in the patent, the court should not be astute in searching for exculpatory changes.

As was pointed out in Vacuum Cleaner Co. v. American Rotary Valve Co., supra, and in the opinion on the motion for preliminary injunction, words like "sufficient vacuum" and "narrow" do not necessarily destroy a claim for lack of definiteness, nor are they to be deprived of reasonable elasticity, provided always that the court is satisfied that the disclosure of the patent is clear and practicable, and that the invention on its merits is entitled to an interpretation which will preserve to the inventor the just results of his contribution. Woerheide v. H. W. Johns-Manville Co. (D. C.) 215 Fed. 604; Id., 220 Fed. 674, 136 C. C. A. 316; Eibel Process Co. v. Remington Martin Co., 234 Fed. 624, Circuit Court of Appeals for the Second Circuit.

It was sought to cast some doubt upon the testimony and experiments of Reeve. But, while not failing to appreciate the sincerity and ability of the fascinating Lucke, I think Reeve must be recognized as the foremost expert in this art. This position he has attained through many years of painstaking and laborious study and experiment, and if there are occasionally inconsistencies in the testimony given by him on different occasions, they are due to his frankness, and to the fact that he does not insist that every experiment he ever made, or every conclusion he ever stated, must necessarily be right, even though later investigation has shown him previous errors. Consistency is not always a jewel, and the expert, who realizes that later and wider investigations point out earlier error, and frankly so states, invites the confidence of the court much more readily than he who persists in endeavoring to reconcile inconsistent statements.

Finally, the contention is made that defendant's devices are constructed in accordance with the disclosure of the Cummings patent of 1891 (No. 460,935). The testimony of the son of Cummings confirms the conclusion arrived at in the American Rotary Valve Co. Case that the Cummings tool was impracticable. Cummings was something of an inventor, and, although a man of limited means, certain inventions of his in other directions were successful. He actually experimented with the device of his patent in a woodworking establishment, for the purpose of sucking the sawdust and chips away from the woodworking machine. His son, who was an intelligent and truthful man, testified that, when the cumbersome Cummings device was used on a strip of carpet, it was found that it stuck to the carpet and was not practicable. Thereupon expedients were tried to overcome this difficulty, and one method was to put castors under the box, and then to put lips across the edge of the box, and finally to put the box on a truck, thus lifting the hood off the surface to be cleaned. In

other words, when there was a sealing contact the Cummings device did not work, and when there was not a sealing contact the device naturally would work only to draw up surface dirt and litter.

Cummings' son did the best he could to interest people in his father's invention, but failed. It must not be forgotten that Kenney was also a man of very moderate means, and the reason for his success was the inherent merit of his invention, and the reason for the failure of Cummings was, not the latter's poverty, but the lack of merit of his device; and, after all, the best answer is that no one would think to-day of using the Cummings device.

Without further discussion, I am fully satisfied that claim 4 is valid, and, notwithstanding that defendant's machines have a wider slot or mouth than Kenney's preferred form, and a lower vacuum, it seems to me that they infringe claim 4.

[3] On the question of an accounting, an interesting situation has arisen. I still remain satisfied that defendant was not a willful infringer. I think that Rosenfield conscientiously tried to avoid the Kenney patent. He evidently saw the commercial possibilities of a small portable machine, which the housewife could operate, and for all practical purposes succeeded in producing a useful commercial article. He waited until the Cummings patent expired, and first put his machine on the market in the early part of 1910. Undoubtedly more was claimed for the Cummings machine by plaintiff's predecessor than that machine was entitled to, and the fact that Rosenfield thus waited is some evidence of his desire to avoid infringement of an existing patent.

On November 1, 1910, a letter was sent by plaintiff company to the Rosenfield Manufacturing Company (the original name of defendant company), notifying the latter of its infringement of the patent in suit, and threatening a lawsuit. On November 12, 1910, Mr. Kent, the attorney for the Rosenfield Company, replied, stating, in effect, that he had advised his client that the "suction cleaner manufactured and sold by it does not infringe any of the claims of this patent," and asking for the numbers and dates of "any other patents owned by the Vacuum Cleaner Company which you think my client is infringing."

On November 14, 1910, plaintiff's counsel asked for detailed information, blueprint, and description of defendant's "suction cleaner," saying:

"On receipt of these I can advise you more fully regarding the patents infringed."

On November 17, 1910, Mr. Kent responded, giving the information required, but no answer was received. Again on May 26, 1911, Mr. Kent wrote to plaintiff's counsel, calling attention to the letters of November 12, 1910, and November 17, 1910, and stating:

"I should be obliged if you would advise me now as you suggest in your letter of November 14th regarding what patents, if any, owned by the Vacuum Cleaner Company, you consider to be infringed by the Magic electric suction cleaner made by Rosenfield Manufacturing Company."

On July 7, 1911, Mr. Kent wrote again, without getting an answer. In April, 1914, Rosenfield, president of defendant company, called upon Jones, managing director of the plaintiff. Jones had been sending threatening letters to a customer of Rosenfield, and Rosenfield went to see him about this matter. Jones rather excused his conduct, and Rosenfield said:

"I would like you to tell me now whether you think this infringes or not, because I know it don't."

And Jones said:

"I will tell you what I will do, Mr. Rosenfield. I will give this to our attorneys, and have them write you about it."

On April 18, 1914, defendant received a letter from the plaintiff stating:

"I find it will be some days before I can write you anything definite, as our lawyers are so busy in court that I cannot get this matter up with them before the first of the week."

Nothing further was heard from Jones or the plaintiff until October 11, 1915, when plaintiff wrote defendant:

"The fundamental David T. Kenney patent, No. 847,947, has been sustained by the United States court, and we hand you herewith copy of the decision. The decree will follow later. We hereby direct your attention to the fact that your machine infringes the sustained claims of this patent, and we must ask you to cease manufacturing and offering it for sale. At the proper time, we shall expect an accounting for such infringing machines as you have already sold."

Throughout this period defendant was showing its machines at public exhibitions, was working in the open, and, in brief, was notoriously carrying on its business. It is plain that for some reason plaintiff concluded not to sue defendant until after the decision on September 30, 1915, in the American Rotary Valve Co. Case.

I am inclined to think that plaintiff thought the wise course was to refrain from suit, or threatening suit, until the American Rotary Valve Case was decided; but, whatever may have been the motive, the fact remains that plaintiff stood by from the fall of 1910 until October, 1915, and deliberately acquiesced in the sale of defendant's machines.

Plaintiff seeks to escape from this conclusion by pointing out the use of the word "other" in Mr. Kent's letter of November 12, 1910. But in transactions of this character the relations of the parties are not to be determined by an isolated expression. Such expressions often escape notice when the parties have their minds upon the substance of a situation rather than upon a close analysis of correspondence. During this period of years it was easy for plaintiff either to have begun suit, or to have threatened suit, or, in any event, to have answered defendant's inquiries, rather than take a course which naturally led defendant to believe that plaintiff did not intend to proceed against it.

I am well aware of the fact that plaintiff has been compelled to institute several litigations, and that a plaintiff cannot be expected to

pursue all infringers at the same time. As has been repeatedly said, each case of laches rests upon its own facts, and in this case I think it would be inequitable to make defendant account for the period between November, 1910, and October, 1915. While, on the one hand, the infringer takes his chances, yet, on the other, where the questions involved are legitimately debatable, and a defendant furnishes full information, and has built up a business and an organization, the owner of the patent, who has knowledge of an infringement, should not be permitted to stand idly by and speculate on the accounting, pending the result of litigations which plaintiff selects, and wisely so, because of the desirability of putting the best foot forward first.

The case, it seems to me, must be placed somewhere between Richardson v. Osborne (C. C.) 82 Fed. 95, affirmed 93 Fed. 828, 36 C. C. A. 610, and Motion Picture Patents Co. v. Laemmle (D. C.) 214 Fed. 787, and thus comes practically to the same result as in Mosler v. Lurie, 209 Fed. 364, 126 C. C. A. 290.

The patent is valid, and claim 4 is infringed, and plaintiff may submit the usual decree, excluding from the accounting the period from November, 1910, to October, 1915.

Settle decree on notice.

## Addendum.

As the Circuit Court of Appeals has adjourned for the summer, I shall, in all the circumstances, suspend the injunction on the following conditions: (1) That an appeal be promptly taken; and (2) that a reasonable bond be furnished by defendant.

As apparently defendant cannot obtain a license, and should not be embarrassed until the Appellate Court renders its decision, I am disposed to make the bond quite moderate. The order suspending the injunction may have the usual provision for leave to apply to vacate or modify same on short notice, so as to assure an early hearing of the appeal.